

**EOD**

09/30/2008

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| CORNERSTONE PRODUCTS, INC., | § | Case No. 05-43533 |
| | § | (Chapter 11) |
| Debtor. | § | |
| _____ | § | |
| | § | |
| WILLIAM HERZOG, as Trustee for the | § | |
| Cornerstone Creditors' Trust, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 06-4235 |
| | § | |
| STOPOL, INC. and | § | |
| STOPOL AUCTIONS, LLC, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| SUNDANCE GENERAL, LLC, | § | |
| | § | |
| Intervenor-Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| STOPOL, INC. and | § | |
| STOPOL AUCTIONS, LLC, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION[1]

This matter is before the Court following trial of the Complaint in Intervention

filed by Sundance General, LLC and the Cross Complaint and Third Party Complaint

---

[1] To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted
as such. Likewise, to the extent any conclusion of law is construed to be a finding of fact, it is hereby
adopted as such. The Court may make additional findings as necessary or as requested by any party.

filed by Stopol, Inc. and Stopol Auctions, LLC.  The primary dispute between the parties

is whether Stopol, Inc. and/or Stopol Auctions, LLC "fraudulently concealed" from the

Debtor, Cornerstone Products, Inc., the existence of purchase orders from third party

buyers for certain of the Debtor's equipment, thereby realizing "secret profits" by

purchasing and then reselling certain machines on their own account.  The Court, having

considered the evidence presented at trial and the arguments of the parties, makes the

following findings of fact and conclusions of law pursuant to Federal Rule of Civil

Procedure 52, as adopted and applied to this adversary proceeding by Federal Rule of

Bankruptcy Procedure 7052.

## I. RELEVANT PROCEDURAL HISTORY

### A. The Bankruptcy Case

Cornerstone Products, Inc. ("Cornerstone" or the "Debtor") filed a voluntary

petition for relief under Chapter 11 of the Bankruptcy Code on July 5, 2005 (the "Petition

Date").[2]  Cornerstone listed total assets of $50,163,347.61 and total liabilities of

$55,957,181.08 in its bankruptcy schedules.  Reggie Sullivan, Cornerstone's president,

was a co-debtor with respect to several of Cornerstone's secured creditors, including the

CIT Group Equipment Financing, Inc. ("CIT"), GE Capital Corporation ("GECC"), Key

Equipment Finance ("Key") and Wells Fargo Equipment Finance, Inc. ("Wells Fargo").

---

[2] The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (the "BAPCPA") significantly amended many provisions of the Bankruptcy Code.  The revisions made to the Bankruptcy Code by the BAPCPA apply to cases filed after October 17, 2005.  *See* BAPCPA, 109 P.L. 8 § 1501(b)(1) ("the amendments made by this Act shall not apply with respect to *cases commenced* under title 11, United States Code, before the effective date of this Act.") (emphasis added); *see also, e.g., In re Kilroy,* 354 B.R. 476, 496-97 (Bankr. S.D. Tex. 2006).  Because the Debtor commenced this bankruptcy case prior to the BAPCPA's effective date, the Court looks to the pre-BAPCPA version of the Bankruptcy Code in determining the parties' disputes.

Prior to Cornerstone's bankruptcy, Mr. Sullivan personally guaranteed Cornerstone's obligations to these and other secured creditors.

Cornerstone obtained authority to liquidate its assets, as detailed below, and filed a plan in which it proposed to distribute the proceeds from the liquidation of its assets. Cornerstone's auctioneer conducted an auction of Cornerstone's assets on February 8, 2006. On February 16, 2006, the Court entered an order confirming the Second Amended Plan of Liquidation for Cornerstone Products, Inc., as Modified (the "Plan").

The Cornerstone Creditors' Trust (the "Trust") was established pursuant to the Plan. The Trustee, William Herzog, was appointed as representative of the Trust. Article I of the Plan defines the "Trust Assets" as, among other things, "all Causes of Action." Article I of the Plan defines the term "Causes of Action," in pertinent part, as follows:

> [A]ny and all claims, objections to claims, causes of action, cross claims or counterclaims held, or assertable by, the Debtor that have been or could have been brought on or after the Petition Date, including … any and all claims, causes of action, counterclaims, demands, or controversies, against third parties on account of … fraud, deceit, misrepresentation, … conflicts of interest, … breach of fiduciary duty, breach of any alleged special relationship, … obligation of fair dealing, obligation of good faith ….

Article XIII of the Plan provides that this Court retains exclusive jurisdiction to hear and determine all "Causes of Action." Article XIII further provides that, notwithstanding consummation of the Plan, this Court will retain jurisdiction "to hear and determine all controversies, suits and disputes that arise in connection with the interpretation, implementation, effectuation, consummation or enforcement" of the Plan and "to determine any dispute with any creditor or party in interest," among other things.

In addition to creating the Trust, the Plan provided that Mr. Sullivan would form "Sullivan Liquidations" to liquidate the collateral of First United Bank & Trust Company

3

and First United Venture Capital Corporation (collectively, "<u>FUB</u>").  FUB held a senior

lien on Cornerstone's manufacturing facility, machinery, equipment, molds, furniture and

fixtures (except to the extent specifically pledged to another lender), and Mr. Sullivan

had personally guaranteed Cornerstone's obligations to FUB.  Sundance General, LLC

("<u>Sundance</u>") is the entity formed by Mr. Sullivan and referred to in the Plan as "Sullivan

Liquidations."

## B. The Adversary Proceeding

On November 1, 2006, the Trustee initiated this adversary proceeding against

Stopol, Inc., Stopol Auctions, LLC (together with Stopol, Inc. the "<u>Stopol Entities</u>"), and

Neal Kruscke, Jr.  The Trustee's Original Complaint included claims for breach of

fiduciary duty, fraud, fraud by nondisclosure, negligent misrepresentation, exemplary

damages, breach of contract, conspiracy, disgorgement and attorneys' fees.  The Court

subsequently granted Sundance leave to intervene in this adversary proceeding, and

Sundance filed a Complaint in Intervention on March 9, 2007.  In its Complaint in

Intervention, Sundance asserted claims against the Stopol Entities and Mr. Kruscke for

breach of contract, breach of fiduciary duty, fraud, conspiracy, negligent

misrepresentation, and attorneys' fees.  Sundance also asserted claims against the Trustee

for declaratory judgment in its Complaint in Intervention.

On April 11, 2007, the Stopol Entities and Mr. Kruscke answered the Complaint

in Intervention and asserted a Cross-Complaint and Third Party Complaint against

Sundance and Reggie Sullivan.  On May 30, 2007, Mr. Kruschke was dismissed from this

adversary proceeding pursuant to an Agreed Order of Dismissal Without Prejudice.  On

May 31, 2007, the Trustee executed a document entitled "Assignment of Stopol Causes

4

of Action" whereby the Trustee assigned to Sundance all of his right, title and interest in the claims asserted by the Trustee in this adversary proceeding.

## II. RELEVANT BACKGROUND

### A. The Auction/Liquidation Agreement

Prior to bankruptcy, Cornerstone was in the business of designing, manufacturing and marketing plastic container products, including indoor and outdoor waste containers, storage totes and bins, laundry baskets and hampers, and commercial trash cans. FUB asserted claims against Cornerstone in the aggregate amount of approximately $8,694,930.51 in Cornerstone's bankruptcy case. In addition to Mr. Sullivan's guaranty, FUB's claims were secured by pre-petition liens in substantially all of Cornerstone's assets.

Shortly after the Petition Date, Cornerstone began the process of liquidating its assets to pay creditors. In October and November 2005, as part of the bankruptcy liquidation process, Mr. Sullivan discussed an auction of Cornerstone's assets with various entities and individuals, including the Stopol Entities and DoveBid, Inc. ("DoveBid"). DoveBid and the Stopol Entities submitted written auction proposals to Cornerstone. The key difference between the proposals by the Stopol Entities and DoveBid was the "buyer's premium" (*i.e.*, a premium to be paid by purchasers of the Cornerstone's assets) included in DoveBid's proposal.

Cornerstone eventually selected the Stopol Entities as its auctioneer and pre-auction sales agent. Mr. Kruschke is the sole shareholder of Stopol, Inc. and the sole member of Stopol Auctions, LLC. Stopol, Inc., which Mr. Kruschke formed in 1990, buys and sells used machinery in the plastics industry. Stopol Auctions, LLC, which Mr.

5

Kruschke formed in 2004 according to his trial testimony, is in the business of auctioning plastic processing machinery.   The Stopol Entities are headquartered in Ohio and are experienced in the sale of plastics machinery.   The Stopol Entities, however, had not previously conducted a bankruptcy auction or assisted in the bankruptcy liquidation process.

According to Mr. Kruschke, one of the main reasons Mr. Sullivan selected the Stopol Entities was because the Stopol Entities – unlike other auctioneers in the industry – had the ability not only to auction equipment through Stopol Auctions, LLC, but also to sell equipment through Stopol, Inc.   Mr. Kruschke represented to Mr. Sullivan that he could obtain 20% more for some of Cornerstone's equipment by selling the equipment prior to the auction.   Mr. Sullivan testified that it was important to him to sell as many of Cornerstone's assets for the highest price possible so as to limit his personal liability to FUB and other secured creditors based on his guarantees of Cornerstone's obligations.

Mr. Kruschke did not intend to market all of Cornerstone's assets to third party purchasers prior to the auction.   Mr. Kruschke intended, instead, to purchase certain of Cornerstone's assets through Stopol, Inc. and then resell those assets to third parties.   In or around November 2005, Mr. Sullivan and Mr. Kruschke discussed the possibility that Stopol, Inc. might buy some of Cornerstone's assets on its own account and then retain any profit from the sale to third parties.   As discussed more fully below, Mr. Kruschke submitted a written proposal for the purchase of sixteen machines to Mr. Sullivan on November 14, 2005.

Mr. Sullivan, as the president of Cornerstone, Mr. Kruschke, as the CEO and president of Stopol, Inc., and Scott Mahalik, as auctioneer, signed an Auction/Liquidation

Agreement on November 18, 2005.[3]   The Auction/Liquidation Agreement states in Paragraph 1(A) that "[t]his agreement is entered into by and between the above described Seller, Auctioneer (as defined below), and Stopol Inc."   Mr. Kruschke testified that both Stopol, Inc. and Stopol Auctions, LLC were necessary parties to the Auction/Liquidation Agreement inasmuch as the Auction/Liquidation Agreement contemplated an auction, which only Stopol Auctions, LLC could conduct, as well as pre-auction sales of Cornerstone's property, which only Stopol, Inc. could accomplish.   Paragraph 11 of the Auction/Liquidation Agreement, entitled "Indemnification of Stopol & Auctioneer," provided that Cornerstone would indemnify "Stopol" and Mr. Mahalik from all disputes arising from or relating to "(a) any false or incorrect representations or warranties contained herein or for any breach of the Seller's obligations hereunder …, or (b) the condition of the Equipment or Assets."   Paragraph 13(E) of the Auction/Liquidation Agreement contains an Ohio choice of law provision.

On November 21, 2005, Cornerstone filed an Expedited Motion to Approve Sale of Personal Property (the "Sale Motion").   In connection with the Sale Motion, the Debtor filed an Expedited Application Pursuant to Sections 327(a) and 328(a) to Authorize the Employment and Retention of Stopol Auctions, LLC as Auctioneers/Liquidators for the Debtor (the "Employment Application").   Cornerstone thereby sought authority to employ Stopol Auctions, LLC to market and liquidate "the molds, machinery and equipment set forth on Exhibit "A" . . . along with other miscellaneous items of property such as furniture and computers (collectively, the "Property") as the Debtor may direct."   Mr. Kruschke, as the president of Stopol

---

[3] Mr. Kruschke testified that Mr. Mahalik has been in charge of the day-to-day operations of Stopol Auctions, LLC since its formation.

7

Auctions, LLC, executed an affidavit in support of the Employment Application in which he stated that Stopol Auctions, LLC was "disinterested" within the meaning of 11 U.S.C. §101(14).  Although Mr. Sullivan was aware that Stopol, Inc. intended to buy some of Cornerstone's assets on its own account, neither Cornerstone nor Mr. Kruschke disclosed this fact in the Employment Application.[4]  Cornerstone also did not seek employment of Stopol, Inc., perhaps due to confusion arising from the common ownership and related nature of the Stopol Entities.

The Court heard the Sale Motion and the Employment Application on December 1, 2005.  At the hearing, in response to questions from Cornerstone's counsel, Mr. Kruschke testified about the number of sales people he employed and his ability to sell equipment prior to an auction.  Cornerstone did not ask Mr. Kruschke about his intent to purchase and then re-sell certain of Cornerstone's property, and Mr. Kruschke did not disclose this intent to the Court.  Following the hearing, on December 16, 2005, the Court entered an Amended Order Granting Expedited Motion to Approve Sale of Personal Property ("Sale Order") approving the Sale Motion.  Additionally, the Court approved the Application to Employ Stopol Auctions, LLC by an order entered on December 9, 2005 ("Employment Order").  The Employment Order expressly deleted the indemnification provisions in paragraph 11 of the Auction/Liquidation Agreement and approved the remainder of the Auction/Liquidation Agreement.

### B. Cornerstone's Agreements with Secured Creditors

In a letter dated November 10, 2005, Wells Fargo and Cornerstone entered into an agreement regarding Wells Fargo's secured interest in certain of Cornerstone's property.

---

[4] There was no evidence at trial that counsel for Cornerstone was aware that Stopol, Inc. intended to purchase any of Cornerstone's assets at the time he drafted the Employment Application or at the time of the hearing on the Employment Application.

The agreement provided, in part, that Cornerstone would agree to the entry of an order lifting the automatic stay with respect to Wells Fargo and its collateral. Wells Fargo agreed to forbear from enforcing its lien rights or otherwise attempting to collect from Cornerstone and, with respect to Mr. Sullivan's obligation to Wells Fargo as guarantor, agreed to forbear for a period of time provided that Wells Fargo received a payment each month of $15,000. Wells Fargo further agreed to the employment of Stopol, Inc. to sell Wells Fargo's collateral subject to Wells Fargo's consent. The Court entered an order approving the letter agreement on January 4, 2006.

In a letter dated November 14, 2005, CIT and Cornerstone entered into an agreement regarding CIT's secured interest in certain of Cornerstone's property. The agreement provided, in part, that Cornerstone would agree to the entry of an order lifting the automatic stay with respect to CIT and its collateral. CIT, like Wells Fargo, agreed to forbear from enforcing its lien rights or otherwise attempting to collect from Cornerstone and, with respect to Mr. Sullivan's obligation to CIT as guarantor, agreed to forbear provided that CIT received a payment each month of $15,000. CIT, like Wells Fargo, further agreed to the employment of Stopol, Inc. to sell CIT's collateral subject to CIT's consent. The Court entered an order approving the letter agreement on January 5, 2006.

In December 2005, subsequent to approval of the Sale Motion, Cornerstone reached an agreement with its Official Unsecured Creditors' Committee and FUB. The Compromise and Settlement Agreement (the "FUB Settlement") provided that Cornerstone would assign all of the estate's rights in FUB's collateral, including all of Cornerstone's equipment and molds located at Cornerstone's manufacturing facility in Durant, Oklahoma, to FUB in lieu of foreclosure. The FUB Settlement provided that

9

"[s]uch assignment will be automatically effected upon the Bankruptcy Court's approval of this Settlement Agreement."  The FUB Settlement further provided that FUB agreed to assign all of its interests in the property transferred to it by Cornerstone to Sullivan Liquidations for the sole purpose of liquidation and subject to liens in favor of FUB.

The Court entered an order approving the FUB Settlement on January 9, 2006. As contemplated in the FUB Settlement, the order stated that the FUB Settlement was effective upon entry of the order.  The order also stated, in pertinent part, that "notwithstanding any provision of the [FUB Settlement] to the contrary, the assignment of the FUB Collateral to FUB and by FUB to Sullivan Liquidations shall be treated as an assignment directly to Sullivan Liquidations …."

### C. Pre-Auction Sales of Property to Stopol, Inc.

The primary dispute in this adversary proceeding arises from pre- and post-auction sales of Cornerstone's property to Stopol, Inc.  Sundance asserts that Stopol, Inc. purchased some of Cornerstone's property for itself without revealing to Cornerstone, prior to the purchase, that it had obtained offers from third parties to purchase the property for a higher amount.  Stopol, Inc. responds that its purchases of Cornerstone's property were made at the request of Reggie Sullivan, and that the prices it paid for the property were agreed upon by Mr. Sullivan and the relevant secured creditors.

As previously discussed, on November 14, 2005, Stopol, Inc. submitted a Proposal for Purchase to Cornerstone.  The attached terms stated that Cornerstone desired to sell sixteen plastic molding machines for the lump sum of $3,110,000.  Although Mr. Kruschke testified that he and Mr. Sullivan had agreed that Stopol, Inc. would buy these machines on its own account, the terms attached to the Proposal for Purchase are the

10

standard terms used by Stopol, Inc. for all of its purchase proposals.  The attached terms stated that, upon locating a buyer, Stopol, Inc. could arrange for the buyer to inspect the machines that, if the buyer decided to purchase the equipment, Cornerstone would be bound to sell the equipment at the purchase price set forth in the Proposal for Purchase.

The machines described in the November 14th Proposal for Purchase included several machines in which GECC had a secured interest.  GECC, however, refused to allow Cornerstone to sell those machines.  Accordingly, on December 8, 2005, Stopol, Inc. submitted an amended Proposal for Purchase which proposed the sale of the nine machines in which GECC did not have a secured interest for the lump sum of $2,190,000. The proposed sales prices for the nine machines were the same as the prices listed in the original November 14th Proposal for Purchase:

| Description | Purchase Price |
|---|---|
| 1997 300-ton Cincinnati | $55,000.00 |
| 1997 300-ton Cincinnati | $55,000.00 |
| 1999 500-ton Husky | $155,000.00 |
| 1999 500-ton Husky | $155,000.00 |
| 1993 750-ton Engel | $50,000.00 |
| 2000 990-ton Husky | $250,000.00 |
| 2002 1500-ton Cincinnati | $335,000.00 |
| 1996 2200-ton Cincinnati | $280,000.00 |
| 2003 3000-ton Cincinnati | $855,000.00 |
| TOTAL | $2,190,000.00 |

On December 22, 2005, Mr. Sullivan sent electronic messages to FUB and Key regarding several of the machines listed on Stopol, Inc.'s December 8th Proposal for Purchase.  With respect to FUB, Mr. Sullivan stated that "Stopol" had a firm offer for the purchase of three of the machines in which FUB had a secured interest– the 3000-ton Cincinnati machine for $855,000, the 750-ton Engel machine for $50,000, and the 2200-ton Cincinnati machine for $280,000.  Mr. Sullivan stated in his message that this price

11

was "net to FUB." With respect to the 300-ton Cincinnati machine, Mr. Kruscke and Mr. Sullivan testified at trial that they understood that Stopol, Inc. planned to buy the machine on its own account and that payment would be made as soon as Stopol, Inc. had re-sold the machine. Mr. Sullivan testified that he thought this would be a matter of a few weeks, but Mr. Kruschke testified that the prospective purchaser lost interest. Mr. Kruschke, however, remained interested in purchasing the machine.[5]

With respect to Key, Mr. Sullivan stated in his electronic message on December 22, 2005, that "Stopol has a firm offer" to purchase two machines in which Key Finance had a secured interest for $55,000 each. Key Finance approved the sale on December 27, 2005. The two machines were, in fact, purchased by Stopol, Inc. for $55,000 each, which is the price listed for those machines in Stopol, Inc.'s December 8th Proposal for Purchase. Stopol, Inc. had received an offer on December 22, 2005 to purchase one of the machines for $75,600. Mr. Kruschke testified that Stopol, Inc. did not convey the December 22nd purchase offer to Mr. Sullivan, Key or any other party in interest.

On January 11, 2006, Stopol submitted a Proposal for Purchase regarding one of the machines listed in its December 8th Proposal for Purchase. The price for the machine in the January 11th Proposal for Purchase was the same as the price listed in the December 8th Proposal for Purchase -- $50,000. FUB had a secured interest in the machine and consented to the sale. Stopol, Inc. wired $50,000 to FUB for the purchase of the machine on January 19, 2006, and stated in an electronic message to FUB on the

---

[5] Mr. Kruschke testified about "Stopol's" intent to purchase this machine at a hearing on May 1, 2006. The Court at that time inquired as to whether an auctioneer retained by the bankruptcy estate could properly purchase an asset of the estate. The Debtor subsequently refused to sell the machine to Stopol, Inc. and offered, instead, to convey title directly to a third party purchaser. Stopol, Inc., however, had not located a third party purchaser. The machine was disassembled and moved to an unheated warehouse where it remained as of trial.

same date that Stopol, Inc. was the purchaser. Stopol, Inc. had received an offer to purchase this machine on December 8, 2005 for $85,000. Mr. Kruschke testified that Stopol did not convey the December 8th purchase offer to Mr. Sullivan, FUB or any other party in interest.

The parties presented competing evidence regarding the purpose and intent of Stopol, Inc.'s written Proposals for Purchase. Mr. Sullivan testified that he believed that Stopol, Inc. had located third party buyers for Cornerstone's property when Stopol, Inc. submitted the November 14th Proposal for Purchase. Mr. Sullivan denied that he was aware that Stopol, Inc. intended to purchase and re-sell the property listed in the December 8th Proposal for Purchase, retaining any profit for itself. Although he admitted in his testimony that he knew Stopol, Inc. intended to purchase some of Cornerstone's property, he testified that he believed that Stopol, Inc. would be compensated by a 5% commission on sales to third parties as provided in the Auction/Liquidation Agreement.

In contrast to Mr. Sullivan's testimony, Mr. Kruschke testified that Stopol, Inc. is in the business of buying and reselling equipment relating to the plastic molding industry. Mr. Kruschke testified, credibly, that the prices set forth in his proposals were the prices that Mr. Sullivan had informed him that he would accept for Cornerstone's machines. Although the November 14th and December 8th Proposals for Purchase state that Stopol, Inc. would be seeking a buyer for the machines, Mr. Kruschke testified that Mr. Sullivan knew Stopol, Inc. planned to purchase the machines for itself for the agreed-upon prices and then re-sell the machines to third parties.

In December 2005 and January 2006, Mr. Sullivan and Mr. Kruschke exchanged electronic messages regarding Stopol, Inc.'s failure to sell any significant assets prior to

13

the scheduled auction.  Mr. Sullivan was becoming increasingly concerned about the lack of pre-auction sales as time passed and the "stand still" agreements he had negotiated regarding his guarantees were about to expire. In a December message, Mr. Sullivan stated that GECC was continuing to litigate against him personally and expressed a desire to "get GE out of the picture."  Mr. Sullivan asked whether Mr. Kruschke could "buy the machines in STOPOL ….?"  In a January message, Mr. Sullivan reminded Mr. Kruschke that his "deal" with CIT and Wells Fargo was about to expire and his "cost to settle will go up by hundreds of thousands of dollars."  Mr. Sullivan asked when Mr. Kruschke planned "to take care of this issue in a combination of sales plus Stopol purchases of the machines in question" as they had previously discussed.   Under the foregoing circumstances, Mr. Sullivan's testimony that he was unaware that Stopol, Inc. intended to purchase and re-sell for a profit the machines described in the November 14th and December 8th Proposals for Purchase was not credible.   Furthermore, Mr. Sullivan's testimony is contradicted by Mr. Sullivan's claim in this adversary proceeding seeking to enforce an agreement to purchase the 2003 300-ton Cincinnati machine for $855,000.

Mr. Kruschke testified at trial that a number of parties were interested in Cornerstone's machines.  He further testified, however, that as soon as the interested parties heard there would be an auction, those parties stopped trying to negotiate private sales.  The interested parties hoped to purchase the machines at the auction for pennies on the dollar.  According to Mr. Kruschke, "there is no way Stopol, Inc. could consummate deals … without controlling the sale …."  Mr. Kruschke testified that he remained interested in purchasing the machines described in his December 8th Proposal for Purchase, because he thought that if Stopol, Inc. purchased the machines from

Cornerstone, Cornertone would receive more than the machines would bring at auction, and Stopol, Inc. would receive more by re-selling the machines than it would receive as a commission from the auction.

### D. Stopol, Inc.'s Pre-Auction Agreements with CIT and Wells Fargo

On or around January 27, 2006, Mr. Kruschke and counsel for the Stopol Entities participated in a telephone conference with counsel for Cornerstone, CIT, Wells Fargo and FUB.  The parties discussed the possibility that Stopol, Inc. might buy some of Cornerstone's assets and the prices at which the secured creditors would agree to release their liens on specific equipment.  Immediately after the telephone conversation, Stopol, Inc. submitted to Cornerstone a Proposal for Purchase relating to eight machines for the lump sum of $2,900,000:

| Description | Purchase Price | Creditor |
|---|---|---|
| 2003 3000-ton Cincinnati | $855,000.00 | FUB |
| 2000 990-ton Husky | $247,500.00 | WF |
| 2000 990-ton Husky | $247,500.00 | WF |
| 2000 1650-ton Husky | $500,000.00 | WF |
| 2000 1650-ton Husky | $500,000.00 | WF |
| 2002 1500-ton Cincinnati | $330,000.00 | WF |
| 1997 1000-ton Cincinnati | $110,000.00 | Key |
| 1997 1000-ton Cincinnati | $110,000.00 | Key |
| TOTAL | $2,900,000.00 | |

Although Cornerstone, FUB and Wells Fargo understood that Stopol, Inc. intended to purchase the eight machines on its own account for the prices described in the Proposal for Purchase, the Proposal for Purchase contained terms identical to the prior Proposals for Purchase – that is, on its face, it appeared that Stopol, Inc. was proposing to attempt to sell the eight machines to third parties rather than to purchase the eight machines for the stated prices.

15

Immediately upon reaching an oral agreement as to the prices Stopol, Inc. would pay for the eight machines, Mr. Kruschke instructed his salespeople to sell the eight machines by informing interested parties that Stopol, Inc. had purchased the machines and that the machines would not be offered at the auction.  Stopol, Inc. obtained purchase orders from United Plastic by January 31, 2006, to buy two of the Husky machines in which Wells Fargo had a secured interest.  In addition, Stopol, Inc. obtained a purchase order from Hi-Tech by February 2, 2006, to buy a Cincinnati machine in which CIT had a secured interest.  Stopol, Inc. did not disclose the existence or terms of these purchase orders to Mr. Sullivan or Cornerstone.

Stopol, Inc. submitted a second, unrelated Proposal for Purchase to Cornerstone on January 27, 2007.  In the second January 27th Proposal for Purchase, Stopol, Inc. proposed to purchase a package of molds and components in which FUB had a secured interest for the total sum of $855,000.  Mr. Kruschke testified that Mr. Sullivan knew that Stopol, Inc. intended to buy these items from Cornerstone to include in a larger purchase order from Carlisle Food Service.  However, Mr. Kruschke did not disclose to Mr. Sullivan the details of the deal with Carlisle Food Service or that Carlisle Food Service would be paying Stopol, Inc. $1,100,000 for the property included in the January 27th Proposal for Purchase.

Prior to the auction, and consistent with its January 27th Proposal for Purchase, Stopol, Inc. entered into a written agreement to purchase certain equipment belonging to Wells Fargo.  In particular, on or about February 2, 2006, Stopol, Inc., Cornerstone and Wells Fargo entered into an Agreement and Bill of Sale whereby Stopol, Inc. agreed to purchase certain equipment from Wells Fargo for the total sum of $1,495,000.  An initial

16

installment of $250,000 was due on February 3, 2006, with the balance to be paid not later than February 17, 2006.  The Agreement and Bill of Sale stated -- in bold -- as follows:

> Buyer agrees that the Equipment may be sold at the February 8, 2006 auction on Seller's premises, and Lienholder consents to such a sale, only if all of the following conditions are met by Buyer (who will be acting as auctioneer): (a) the winning bid for any item of the Equipment, when added to the aggregate sale proceeds received from any other items of Equipment that have previously been sold by Buyer, is equal to, or greater than, the amount of the Balance, OR the 1650 ton machines are sold for at least $500,000 each and the 900 ton machines are sold for at least $247,500 each; (b) bidders at the auction shall be instructed by Buyer that, notwithstanding payment for an item of Equipment by the winning bidder, such item may not be removed from Seller's premises unless and until Buyer has paid the Balance due to Lienholder; and (c) no item of Equipment sold in the auction shall be removed from Seller's premises until the Balance has been paid in full to Lienholder.

After submitting the January 27th Proposal for Purchase to Cornerstone and before signing this agreement with Wells Fargo, Stopol, Inc. received offers to purchase two of Wells Fargo's machines for approximately $90,000 more than Stopol, Inc. had offered. Stopol, Inc. did not disclose these purchase offers to anyone.

Additionally, on or about February 2, 2006, Stopol, Inc., Cornerstone and CIT entered into an Agreement and Bill of Sale whereby Stopol, Inc. agreed to purchase certain equipment from CIT for the total sum of $730,000.  An initial installment of $150,000 was due on February 3, 2006, with the balance to be paid not later than February 17, 2006.  Similar to the agreement with Wells Fargo, the Agreement and Bill of Sale between CIT and Stopol, Inc. stated -- in bold -- as follows:

> Buyer agrees that the Equipment may be sold at the February 8, 2006 auction on Seller's premises, and Lienholder consents to such a sale, only if all of the following conditions are met by Buyer (who will be acting as auctioneer): (a) the winning bid for any item of the Equipment, when added to the aggregate sale proceeds received from any other items of

17

Equipment that have previously been sold by Buyer, is equal to, or greater than, the amount of the Balance, OR each item of Equipment is sold at the auction for at least the amount shown on Schedule A hereto; (b) bidders at the auction shall be instructed by Buyer that, notwithstanding payment for an item of Equipment by the winning bidder, such item may not be removed from Seller's premises unless and until Buyer has paid the Balance due to Lienholder; and (c) no item of Equipment sold in the auction shall be removed from Seller's premises until the Balance has been paid in full to Lienholder.

On February 7, 2006, Stopol, Inc. submitted a purchase proposal to Cornerstone for one of the Cincinnati injection molding machines that was to be offered at the auction. This machine was not included in the January 27th Proposal for Purchase. FUB had a secured interest in this machine, and Stopol, Inc. offered to pay $10,000. The Stopol Entities did not disclose to Cornerstone, FUB or any other party in interest that Stopol, Inc. had received an offer from a third party to purchase this machine for $30,000 on February 6, 2006.

### E. Sales at the Auction and Post-Auction Sales

A live auction of the property belonging to Cornerstone and FUB was conducted "without reserve" on February 8, 2006, at Cornerstone's manufacturing facility in Durant, Oklahoma. Scott Mihalic conducted the auction. Stopol, Inc. included in the auction those machines it believed it had purchased pursuant to the Proposals for Purchase but had not yet re-sold. One of the machines sold for more than the amount listed in the Proposal for Purchase, one sold for less, and some were not sold.

Pursuant to the Auction/Liquidation Agreement and the FUB Settlement, Stopol Auctions, LLC collected from Cornerstone a 5% commission for the property sold at the auction. The total commission paid to Stopol Auctions, LLC pursuant to the

Auction/Liquidation Agreement was $111,448.75.[6] With respect to the pre-auction sales, however, Mr. Kruscke testified at a hearing on May 1, 2006, that Stopol, Inc. purchased the lion's charge of the pre-auction items and that Stopol, Inc. did not charge a 5% commission on the pre-auction sales because "we did not believe it was appropriate to charge a 5% commission on items that we purchased."

On February 14, 2006, Stopol, Inc. submitted a purchase proposal to Cornerstone for a 1999 1100-ton HMP machine in which FUB had a secured interest. The purchase price was $85,000. Mr. Kruscke testified that Stopol, Inc. was simply selling this machine to a third party, not purchasing the machine for himself. Mr. Kruschke further testified that Stopol, Inc. was entitled to a 5% commission on this sale pursuant to the Auction/Liquidation Agreement. Stopol, Inc. did not, however, charge Cornerstone a commission for the sale.

On February 15, 2006, Stopol, Inc. submitted a purchase proposal for another 1999 1100-ton HMP machine in which FUB had a secured interest. Stopol, Inc. had received an offer to purchase this machine for $85,000 on February 14, 2006. Mr. Kruscke testified that the employee who drafted the purchase proposal mistakenly typed in a purchase price of $70,000. Mr. Kruschke testified that the purchase price should have been $85,000 less Stopol, Inc's commission of 5% -- $80,750. Mr. Kruschke admitted at trial that Stopol, Inc. had not paid Cornerstone the additional $10,750 that Cornerstone would have received from the sale but for Stopol, Inc.'s error.

---

[6] In addition to its 5% commission, Stopol Auctions, LLC charged purchasers a "buyer's premium." Sundance recovered the "buyer's premium" from Stopol Auctions, LLC pursuant to a prior decision of this Court.

### III. JURISDICTION

As a preliminary matter, the Stopol Entities dispute this Court's jurisdiction over the claims raised in this adversary proceeding.  The Stopol Entities broadly assert in the Joint Pre-Trial Order that "[t]his Court has no jurisdiction to adjudicate, in an adversary proceeding, the claims being asserted by [Sundance]."  In their Trial Memorandum, the Stopol Entities argue more specifically that this Court lacks jurisdiction because the outcome of this adversary proceeding will not alter the rights, liabilities or actions of Cornerstone, nor will it in any way impact upon the handling of the bankruptcy estate. The Stopol Entities also assert that this Court has no subject matter jurisdiction over any dispute relating to the machines that were foreclosed upon by FUB prior to the auction.

Thus, the challenge to this Court's jurisdiction raises two distinct issues.  The first issue is whether or to what extent Cornerstone's agreements with its secured creditors removed the claims relating to the liquidation of those assets from this Court's jurisdiction.  The next issue is the effect of confirmation on the Court's jurisdiction, if any, over the claims asserted in this adversary proceeding.  The Court will discuss each issue in turn.

### A. Effect of Agreements with Secured Creditors

The filing of a bankruptcy petition creates an estate that is comprised of, among other things, "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1).  The phrase "all legal or equitable interests of the debtor in property" has been construed broadly, and includes "rights of action" such as claims based on state or federal law.  *See Am. Nat'l Bank of Austin v. MortgageAmerica Corp.* (*In re MortgageAmerica Corp.*), 714 F.2d 1266, 1274 (5th  Cir.

20

1983); *In re Educators Group Health Trust,* 25 F.3d 1281, 1283 (5th Cir. 1994).  If a claim belongs to the estate, then the bankruptcy trustee has exclusive standing to assert it. *In re Educators Group Health Trust,* 25 F.3d at 1284.  However, the trustee has no right to bring claims that belong solely to the estate's creditors. *See Caplin v. Marine Midland Grace Trust Co.,* 406 U.S. 416 (1972).

The Court recognizes that FUB, CIT and Wells Fargo are linked in a variety of ways to Cornerstone and the bankruptcy proceeding.  FUB, CIT and Wells Fargo are creditors of Cornerstone, and the claims against the Stopol Entities arise from the auction conducted on February 8, 2006.  However, the existence of common parties and shared facts does not necessarily mean that the Court has jurisdiction over all of the claims asserted by Sundance.  Indeed, as *Educators Group Health Trust* demonstrates, it is entirely possible for a bankruptcy estate and a creditor to own separate claims against a third party arising out of the same general series of events and broad course of conduct. *See also Feld v. Zale Corp.* (*In re Zale Corp.*), 62 F.3d 746, 753 (5th Cir. 1995) ("Shared facts between the third-party action and a debtor-creditor conflict do not in and of themselves suffice to make the third-party action 'related to' the bankruptcy [for purposes of finding bankruptcy jurisdiction].").

Turning to the specific facts of this case, FUB foreclosed on its collateral prior to the auction.  While FUB's collateral was property of the estate as of the Petition Date, the stay was lifted to allow FUB to exercise its state law rights - *i.e.,* foreclose on its collateral – and FUB exercised those rights.  Cornerstone's remaining interest in FUB's collateral is, therefore, determined by reference to state law and the Loan Documents.  Both contractually under the Loan Documents and in accordance with Texas law,

Cornerstone had no interest in the proceeds of auction of FUB's collateral unless and until there was a surplus over FUB's contractual, state law calculated debt. Since there was no surplus over the debt owed to FUB, the sale of FUB's collateral at the auction and the post-auctions sales of FUB's collateral did not involve property of the estate in which Cornerstone had an interest.

In contrast, CIT and Wells Fargo did not foreclose on their collateral following the Court's orders granting their motions for relief from the stay. CIT and Wells Fargo, instead, agreed to forebear and allow Sundance to sell their collateral at the auction. Although Cornerstone may have had no equity in the collateral, Cornerstone nonetheless was the owner of the property. Ownership interests in property, and equity in property, are distinct concepts. A debtor may, for example, exempt an interest in property even when the debtor has no equity in the property. *See* 11 U.S.C. §522(f)(1). *See also, e.g., Owen v. Owen,* 500 U.S. 305, 308, 309 (1991) (recognizing bare legal title as an interest in property that passes to the bankruptcy estate); *In re Pluta,* 200 B.R. 740, 742 (Bankr. D. Mass. 1996) (car which creditor had repossessed prepetition and in which debtor had no equity was nonetheless property of the estate). The Court, therefore, concludes that Cornerstone's ownership interest in the equipment securing CIT and Wells Fargo was property of the bankruptcy estate, and the sale of the equipment at the auction and through pre- and post-auction private treaty sales involved property in which the Debtor had an interest within the meaning of §541(a) of the Bankruptcy Code.

### B. Effect of Plan Confirmation

It is well settled that a confirmed plan functions as a contract in its own right. *U.S. Brass Corp. v. Travelers Ins. Group (In re U.S. Brass Corp.)*, 301 F.3d 296, 307 (5th

Cir. 2002); *U.S. v. Ramirez*, 291 B.R. 386, 392 (N.D. Tex. 2002) (stating that a "confirmed Chapter 11 plan constitute[s] a binding contract"). However, since federal courts are courts of limited jurisdiction, having "only the authority endowed by the Constitution and that conferred by Congress," *Epps v. Bexar-Medina-Atascosa Counties Water Improvement Dist. No. 1*, 665 F.2d 594, 595 (5th Cir. 1982) (quoting *Save the Bay, Inc. v. U.S. Army*, 239 F.2d 1100, 1102 (5th Cir. 1981)), the retention of jurisdiction provisions of the Plan cannot confer or expand the Court's subject matter jurisdiction. *U.S. Brass*, 301 F.3d 296 at 303. This Court must look solely to 28 U.S.C. §1334 for its jurisdiction and must consider the effect of confirmation of the Plan on its jurisdiction.

The Fifth Circuit has stated that "Section 1334 does not expressly limit bankruptcy jurisdiction upon plan confirmation." *In re U.S. Brass Corp.*, 301 F.3d at 304. The Fifth Circuit has also stated, somewhat inconsistently, that "[a]fter a debtor's reorganization plan has been confirmed, the debtor's estate, and thus bankruptcy jurisdiction, ceases to exist, other than for matters pertaining to the implementation or execution of the plan." *Bank of Louisiana v. Craig's Stores of Tex., Inc. (In re Craig's Stores of Texas, Inc.),* 266 F.3d 388, 390-91 (5th Cir. 2001). The Fifth Circuit reconciled these statements in *Newby, et al. v. Enron Corp., et al. (In re Enron Corporation Securities),* 535 F.3d. 325 (5th Cir. 2008). In *Newby*, the Fifth Circuit clarified its holding in *Craig's Stores* as one relating to claims brought post-confirmation. Thus, if bankruptcy jurisdiction attaches to a claim prior to confirmation, the bankruptcy court retains jurisdiction over that claim post-confirmation. *See id.* at 335-336.

In the case of *Craig's Stores*, the debtor – after confirmation of its plan – sued its pre-petition credit card servicer (a bank) under the parties' contract. The debtor's state

law claim for damages against the bank "principally dealt with postconfirmation relations between the parties." *In re Craig's Stores of Texas, Inc*., 288 F.3d at 391. The debtor asserted that it could bring its post-confirmation claims against the bank in the bankruptcy court eighteen months after confirmation because as long as a bankruptcy case remains open, jurisdiction exists if a dispute is "related to" the bankruptcy under §1334(b). The Fifth Circuit rejected that expansive view. The Fifth Circuit applied a "narrower perspective" and concluded, on the particular facts of the case, that the bankruptcy court lacked jurisdiction because: (i) the claims principally dealt with post-confirmation relations between the parties, (ii) there was "no antagonism or claim pending between the parties as of the date of the reorganization," and (iii) "no facts or law deriving from the reorganization or the plan were necessary to the claim asserted by [the debtor] against the [b]ank." *Id*. The Fifth Circuit expressly rejected the argument that jurisdiction existed because the status of its contract with the bank would affect its distribution to creditors under the plan, noting that the "same could be said of any other post-confirmation contractual relations . . . ." *Id*.

Here, Cornerstone's Plan was confirmed after the auction. The auction occurred pursuant to orders of this Court, and Stopol, Inc. and Stopol Auctions, LLC were authorized to conduct the auction as well as private treaty sales pursuant to the Employment Order. The Court at that time had jurisdiction over the claims asserted in this adversary proceeding to the extent the claims involve the sale of property of the estate. The Court, therefore, concludes that it has jurisdiction over Sundance's claims regarding "secret profits," among other things, arising from the sale of estate property in which CIT, Wells Fargo, and Key had a secured interest. The Court, however, does not

have jurisdiction over the claims relating the FUB's collateral, which, as previously discussed, was no longer property of Cornerstone's bankruptcy estate at the time of the allegedly improper actions by the Stopol Entities.

## IV. DISCUSSION

Sundance asserts a multitude of claims against the Stopol Entities over which this Court has jurisdiction. In the parties' Joint Pre-Trial Order, Sundance asserts that the Stopol Entities breached their fiduciary duty to Cornerstone and/or Sundance by (1) failing to disclose the existence of numerous offers to purchase molds, machines or equipment and/or misrepresenting the amount of the purchase orders received; (2) buying and then reselling Cornerstone's property for a profit which the Stopol Entities kept; and (3) requiring potential buyers to maintain secrecy. Sundance further asserts that the Stopol Entities breached their contract with Cornerstone by failing to sell Cornerstone's property prior to the auction. Finally, Sundance asserts that the Stopol Entities are liable for fraud for deliberately concealing the existence of numerous offers to purchase items of Cornerstone's property and/or misrepresenting the offers the Stopol Entities had received in order to purchase items of Cornerstone's property for the Stopol Entities' own profit. In the parties' Joint Pretrial Order, Sundance requests that the Court award it attorneys' fees of at least $150,000, pre-judgment interest, and exemplary damages of at least the amount of the 5% commission paid to Stopol Auctions, LLC for disclosed sales of Cornerstone's property.

The Stopol Entities deny that Sundance is entitled to the relief requested. The Stopol Entities assert defenses of estoppel, in pari delecto, and lack of standing. In

addition, the Stopol Entities assert a counterclaim against Mr. Sullivan and Sundance for indemnification and contribution.

### A. Stopol Auctions, LLC Duties to the Estate

As previously discussed, this Court authorized the employment of Stopol Auctions, LLC as an estate professional.  The retention of professionals is governed by §327 of the Bankruptcy Code, which provides in pertinent part that a debtor or bankruptcy trustee may employ an auctioneer or other professional who does "not hold or represent an interest adverse to the estate" and who is a "disinterested person."  11 U.S.C. §327(a).  Generally, a person is disinterested if he:

> (A) is not a creditor, an equity security holder, or an insider;
>
> (B) is not and was not an investment banker for any outstanding security of the debtor;
>
> (C) has not been, within three years before the date of the filing of the petition, an investment banker for a security of the debtor, or an attorney for such an investment banker in connection with the offer, sale or issuance of a security of the debtor;
>
> (D) is not and was not, within two years before the date of the petition, a director, officer, or employee of the debtor or of an investment banker specified in subparagraph (B) or (C) of this paragraph; and
>
> (E) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reasons of any direct or indirect relationship to, connection with, or interest in, the debtor or an investment banker specified in subparagraph (B) or (C) of this paragraph, or for any other reason.

11 U.S.C. § 101(14) (2004).   The concept of an "adverse interest" set forth in §101(14)(E) has sometimes been articulated in terms of motivation – that is, whether the professional possesses "a meaningful incentive to act contrary to the best interests of the estate and its sundry creditors."  *In re Martin,* 817 F.2d 175, 180 (1st Cir. 1987).  *See*

*also, e.g., In re Consolidated Bankshares,* 785 F.2d 1249, 1256 n. 6 (5th Cir. 1986) (adverse interest is one that "may engender conflicting loyalties").

Underlying the "disinterestedness" requirement is "the congressional intention to hold professionals performing duties for the estate to strict fiduciary standards. This section is plainly concerned with a professional's divided loyalties and ensuring that professionals employed by the estate have no conflicts of interest with the estate." *In re Envirodyne Indus., Inc.,* 150 B.R. 1008, 1016 (Bankr. N.D. Ill. 1993). A debtor or bankruptcy trustee owes a fiduciary duty to the bankruptcy estate and, as an agent of the debtor or bankruptcy trustee, an auctioneer is held to the same fiduciary standard. *See In re Crestview Funeral Home, Inc.,* 287 B.R. 832, 838 (Bankr. D. N.M. 2002) (citing *In re Lowry Graphics, Inc.,* 86 B.R. 74, 80 (Bankr. S.D. Tex. 1988)); *In re Q.P.S., Inc.,* 99 B.R. 843, 845 (Bankr. W.D. Tenn. 1989)). The purpose of §327(a) is to ensure that any auctioneer or other professional appointed to represent the estate will tender undivided loyalty and provide untainted advice and assistance in furtherance of their fiduciary responsibilities. *Rome v. Braunstein,* 19 F.3d 54, 58 (1st Cir. 1994); *In re Great Lakes Factors, Inc.,* 337 B.R. 657, 659 (Bankr. N.D. Ohio 2005).

The requirements of §327(a) are effectuated by Federal Rule of Bankruptcy Procedure 2014(a), which provides that the professional must disclose "any proposed arrangement for compensation" and all "connections with the debtor" to the Court. Section 328 of the Bankruptcy Code further provides that professionals may be retained "on any reasonable terms and conditions of employment." If the professional becomes interested or represents or holds an adverse interest at any time during the case, the Court may deny compensation. *See* 11 U.S.C. §328(c); *see also, e.g., In re West Delta Oil Co.,*

27

*Inc.,* 432 F.3d 347 (5th Cir. 2005) (holding that special counsel's involvement with group of investors interested in acquiring debtor's assets was interest adverse to bankruptcy estate that they were required to disclose to bankruptcy court).

Here, Cornerstone's Employment Application disclosed the proposed arrangement for compensating Stopol Auctions, LLC, among other things, and Mr. Kruschke submitted an affidavit in connection with the Employment Application in which he stated that Stopol Auctions, LLC was "disinterested" within the meaning of §101(14) of the Bankruptcy Code.  The Court, following a hearing on the Employment Application, approved the retention of Stopol Auctions, LLC to serve as Cornerstone's auctioneer.  Stopol Auctions, LLC did not purchase any of Cornerstone's property before, during or after the auction.  Moreover, the Employment Application attached a copy of the Auction/Liquidation Agreement in which Stopol, Inc.'s role as Cornerstone's sales agent was described.  The Court finds and concludes that, under the circumstances of this case, Stopol Auctions, LLC was a "disinterested person" within the meaning of §327(a) of the Bankruptcy Code at all relevant times.  The Court further finds and concludes that Stopol Auctions, LLC did not breach its contract with Cornerstone by failing to sell Cornerstone's assets prior to the auction, did not breach any fiduciary duty to Cornerstone or Sundance in connection with Stopol, Inc's private treaty sales, and did not engage in any deliberate fraud.

### B. Stopol, Inc.'s Duties to Cornerstone

Turning to Sundance's breach of fiduciary duty claim against Stopol, Inc., Sundance specifically asserts that the Stopol, Inc. breached its fiduciary duty to

Cornerstone by secretly profiting from the sales of the following property in which CIT, Wells Fargo, and Key had a secured interest:

| Description | Purchase Price | Resale Price | Profit Retained | Lien |
|---|---|---|---|---|
| 1997 1000-ton Cincinnati | $110,000 | $165,000 | $55,000 | Key |
| 1997 1000-ton Cincinnati | $110,000 | $165,000 | $55,000 | Key |
| 2000 1650-ton Husky | $500,000 | $512,000 | $12,000 | WF |
| 2000 1650-ton Husky | $500,000 | $555,000 | $55,000 | WF |
| 2000 990-ton Husky | $247,500 | $305,100 | $57,500 | WF |
| 2000 990-ton Husky | $247,500 | $310,000 | $62,500 | WF |
| 2002 1500-ton Cincinnati | $330,000 | $420,000 | $90,000 | WF |
| 1998 825-ton Husky | $200,000 | $275,000 | $75,000 | CIT |
| 1998 825-ton Husky | $200,000 | $250,000 | $50,000 | CIT |
| 1997 300-ton Cincinnati | $55,000 | $75,600 | $20,600 | Key |
| 1997 300-ton Cincinnati | $55,000 | $50,000 | ($5,000) | Key |

Notably, all but two of these machines were included in Stopol, Inc.'s Proposals for Purchase dated December 8, 2005 and January 27, 2006. The only machines not included in Stopol, Inc.'s Proposals for Purchase are the two 1998 825-ton Husky machines. The Agreement and Bill of Sale dated February 2, 2006 by and between Stopol, Inc. and CIT reflects that CIT required the Stopol Entities to offer these machines at the auction for a minimum price of $200,000. After the two Husky machines failed to find a purchaser at the auction, Stopol, Inc. purchased the two machines for the minimum price established by CIT and then re-sold the machines.

In response to Sundance's breach of fiduciary duty claim, the Stopol Entities assert that Stopol, Inc. had no such duty to Cornerstone. The Stopol Entities argue that the Court should respect their separate corporate status. Since the Employment Application only sought the employment of Stopol Auctions, LLC, and since the Employment Order only authorized the Employment of Stopol Auctions, LLC, the Stopol Entities assert that Stopol, Inc. never became an agent of Cornerstone nor a fiduciary of

Cornerstone's estate.  Thus, the Stopol Entities argue that the claims against Stopol, Inc. for fraud, breach of fiduciary duty and breach of contract should be denied.

Stopol, Inc.'s arguments ignore the fact that it entered into a contract with Cornerstone by executing the Auction/Liquidation Agreement.  In particular, pursuant to the Auction/Liquidation Agreement, Cornerstone retained Stopol, Inc. "to arrange for and to conduct private treaty sales … of any item of property that [Cornerstone] desires to dispose of by private treaty sale …."  Stopol Auctions, LLC was not in the business of conducting private treaty sales, and only Stopol, Inc. could provide this service to Cornerstone.  The Court approved Cornerstone's execution of the Auction/Liquidation Agreement in connection with the Employment Order.

The Court finds and concludes that Stopol, Inc. owed a fiduciary duty to Cornerstone pursuant to the Auction/Liquidation Agreement.  Under Ohio law, which is the choice of law contained in the Auction/Liquidation Agreement, an agency relationship arises when one person authorizes another to do for him what he may lawfully do for himself.  *See, e.g., Bradley v. Farmers New World Life Ins. Co.*, 679 N.E.2d 1178, 1187 (Ohio App. 1996) (agency relationship arises from an agreement in which one person authorizes another to do for him whatever he may lawfully do for himself).  For example, an authorization for a party to sell the property of another creates an agency relationship under Ohio law.  *See, e.g., Worley v. Stoltz*, 113 N.E.2d 28 (Ohio App. 1952) (party was agent of seller for sale of automobile); *Cleveland Trust Co. v. Pomeroy*, 177 N.E.2d 410 (Ohio Com. Pl. 1961) (agency relationship established by implication from the transaction); *Columbus Pip & Equipment Co. v. Ackerson*, 135 N.E.2d 75, 76 (Ohio App. 1953) ("A presumption of an agency may arise from the

manner in which the agent has acted with the consent, or, at least, without the disapproval of the presumed principal."). Thus, in this case, the relationship between Cornerstone and Stopol, Inc., as Cornerstone's sales agent, was a fiduciary one, implying trust and confidence under Ohio law. *See, e.g., Miles v. Perpetual Sav. & Loan Co.*, 388 N.E.2d 1364, 1365-1366 (Ohio 1979) (discussing an agent's fiduciary duty to the principal under Ohio law); *Myer v. Preferred Credit, Inc.,* 766 N.E.2d 612, 623-624 (Ohio App. 2001) (same).

Moreover, while the Court agrees that Stopol, Inc. was not employed as an auctioneer pursuant to §327(a) of the Bankruptcy Code, the Court approved Cornerstone's execution of the Auction/Liquidation Agreement in connection with the Employment Order. That agreement, in turn, provided for Stopol, Inc to arrange for and conduct private treaty sales. The Court, therefore, finds and concludes that Stopol, Inc. was effectively employed as a sales agent pursuant to §327(a) of the Bankruptcy Code and, as such, owed a fiduciary duty to Cornerstone and the bankruptcy estate. *See In re Seatrain Lines,* 13 B.R. 980, 981 (Bankr. S.D. N.Y. 1981) (defining a "professional person" who may be employed under §327(a) to include "persons in those occupations which play a central role in the administration of the debtor proceeding"); *In re Fortune Natural Resources Corp.,* 366 B.R. 558, 563 (Bankr. E.D. La. 2007) (discussing the definition of "professional person" in *Seatrain Lines*).

The determination that Stopol, Inc. owed a fiduciary duty to Cornerstone does not end the Court's inquiry. The question becomes whether Stopol, Inc. breached its fiduciary duty by purchasing some of the assets it was hired to sell to third parties. Some courts have held that bankruptcy trustees, estate professionals, and debtors in possession

are absolutely barred from purchasing property of the bankruptcy estate.   As the

bankruptcy court explained in *Crestview Funeral Home*:

> As a fiduciary of the estate, a bankruptcy trustee and his agents and
> employees may not purchase property of the bankruptcy estate.  *In re
> Rahe,* 178 B.R. 801, 802 (Bankr. D. Neb. 1995), citing *In re Frazin &
> Oppenheim,* 181 F. at 309 and *Q.P.S., Inc.,* 99 B.R. at 845. "Regardless of
> whether the trustee of the trustee's agent and/or employee in fact profits
> from the transaction at the expense of the estate, neither a bankruptcy
> trustee nor his agents and/or employees may purchase properties of the
> estate, even for a *fair* price." *Q.P.S., Inc.,* 99 B.R. at 845, citations
> omitted (emphasis in original).   Accordingly, attorneys, accountants,
> appraisers, and other agents or employees of bankruptcy trustees may not
> purchase property of the bankruptcy estate. *Rahe,* 178 B.R. at 802
> (denying motion for sale of estate property to attorney for the Chapter 7
> trustee).  *See also, In re Allied Gaming Management, Inc.,* 209 B.R. 201,
> 203 (Bankr. W.D. La. 1997) (accountant for chapter 11 estate not allowed
> to acquire estate property through reorganization plan); *and In re Q.P.S.,
> Inc.,* 99 B.R. at 845(accountant for debtor in possession may not purchase
> estate property).  As one court noted, "the objective of this restriction is to
> discourage disloyalty by fiduciaries and eliminate a source of public
> concern over the administration of bankruptcy estates." *See, In re Grodel
> Manufacturing, Inc.,* 33 B.R. 693, 696 (Bankr. Conn. 1983).

*In re Crestview Funeral Home, Inc.,* 287 B.R. at 838.   The concern underlying these

cases is not simply a loss to the estate, but the integrity of the bankruptcy system:

> The question here is not one of fraud or good faith, of gain or loss to the
> estate, in a particular instance. The rule goes far deeper than that. It is
> applicable in every case in order to secure and maintain the impartial
> administration of justice.  Upon no courts is the obligation to enforce these
> principles of public policy greater than upon the courts of bankruptcy.

*Id.* (citing *In re Frazin & Oppenheim,* 181 F. 307, 310 (2nd Cir. 1910)).

This Court, however, agrees with those courts holding that the purchase of assets

of the estate does not constitute a *per se* violation of fiduciary obligations.  "Rather, the

fiduciary need only prove that the transaction was inherently fair.  The essence of the

fairness test is whether or not under the circumstances the transaction carries the

earmarks of an arm's length bargain." *Fulton State Bank v. Schipper (In re Schipper),*

109 B.R. 832, 835-836 (Bankr. N.D. Ill. 1989) (citations omitted); *In re Brook Valley IV,* 347 B.R. 662, 675-676 (8th Cir. BAP 2006) (following *In re Schipper*).  Similarly, a sale of a bankruptcy estate's property outside the ordinary course of business hinges upon whether the sale would be in the estate's best interests, and the important factor in such situations is that the sale be fully disclosed and that vigorous, arms-length, good faith negotiations take place.  *See In re Brook Valley IV,* 347 B.R. at 676.  *See also In re Apex Oil Co.,* 92 B.R. 847, 869-870 (Bankr. E.D. Mo. 1988) (holding that an insider may buy assets of a debtor if there are arms-length, good faith negotiations with full disclosure).

In this case, Stopol, Inc. attempted to sell Cornerstone's property prior to the auction, but, as soon as prospective purchasers learned of the auction, they lost any interest in negotiating private treaty sales.  Mr. Sullivan was aware that Cornerstone would receive pennies on the dollar for its molding machines if they were offered at the auction.  Mr. Sullivan was also aware that Stopol, Inc. was interested in purchasing some of Cornerstone's molding machines.  By agreeing to sell certain molding machines to Stopol, Inc. prior to the advertised auction as detailed in Stopol, Inc.'s Proposals for Purchase, Cornerstone obtained a significantly higher price for the machines, and Stopol, Inc. was able to market and sell the machines for an even greater price since there was no longer an auction on the horizon for those particular machines.

The documentary evidence admitted at trial reflects that Mr. Sullivan encouraged Mr. Kruschke to purchase Cornerstone's property.  His electronic messages expressed his concern about his personal liability to Cornerstone's secured creditors.  For example, in an electronic message to Mr. Kruschke dated January 23, 2006, Mr. Sullivan suggested that Mr. Kruschke take care of "this issue in a combination of sales plus Stopol purchases

33

….” Mr. Kruschke did as Mr. Sullivan requested, and he documented each of his oral agreements with Mr. Sullivan by submitting Proposals for Purchase to Cornerstone.

Although Stopol, Inc., as a professional employed by Cornerstone's estate and as Cornerstone's sales agent under Ohio law, had a fiduciary obligation to disclose to Cornerstone the offers it received to purchase Cornerstone's property, Stopol, Inc. did not have any offers in hand with respect to the machines described in the November 14th and January 27th Proposals for Purchase at the time Mr. Sullivan agreed to sell those machines to Stopol, Inc.  Sundance may not now complain, with the full benefit of hindsight, that the price Mr. Sullivan agreed to accept for Cornerstone's property was too low.  *See Home Ins. Co. v. Matthews,* 998 F.2d 305, 309 (5th Cir. 1993) (discussing the elements of equitable estoppel).  Moreover, in light of the casual way in which Reggie Sullivan and Neal Kruschke did business, as well as Mr. Sullivan's knowledge that Stopol, Inc. intended to purchase some of Cornerstone's property, the Court does not find any intentional fraud by Stopol, Inc. or any other grounds for an award of exemplary damages.  The Court concludes, under the facts of this case, that the sales of Cornerstone's property to Stopol, Inc. were inherently fair and that Stopol, Inc. did not breach its fiduciary duty to Cornerstone under bankruptcy or Ohio law.  *See Strock v. Pressnell*, 527 N.E.2d 1235, 1243 (Ohio 1988) (the elements of breach of fiduciary duty under Ohio law are: "(1) the existence of a duty arising from a fiduciary relationship; (2) a failure to observe the duty; and (3) an injury resulting proximately therefrom.").  The Court further concludes that Stopol, Inc. did not breach its contract with Cornerstone by retaining more than the 5% commission authorized by the Auction/Liquidation

34

Agreement on the challenged sales, because the commission provision did not apply to assets purchased directly by Stopol, Inc.

Finally, the Court addresses Stopol, Inc.'s admission at trial that it made several mistakes with respect to its collection of the commission authorized by the Auction/Liquidation Agreement.  In particular, Mr. Kruschke testified that Stopol, Inc. failed to remit to Cornerstone $10,750 on the sale of the 1999 1100-ton HMP machine described in a February 15, 2006, purchase proposal.  Stopol, Inc. also failed to charge Cornerstone a commission of $4,250 in connection with the sale of another 1999 1100-ton HMP described in a February 14, 2006, purchase proposal.  The Court finds and concludes that the net amount, $6,500 should be paid to Sundance.

## V. CONCLUSION

For the foregoing reasons, the Court concludes that Stopol, Inc. failed to remit $6,500 owed to Cornerstone as required by the Auction/Liquidation Agreement.  The Court, however, finds and concludes that the Stopol Entities did not engage in fraud and did not breach their fiduciary duty to Cornerstone or the bankruptcy estate.  In light of these conclusions, the Court need not address the Stopol Entities' counterclaims for contribution and indemnity.  The Court will enter a separate Judgment consistent with this Memorandum Opinion.

Signed on 9/30/2008

*Brenda T. Rhoades*                    MD

HONORABLE BRENDA T. RHOADES,
UNITED STATES BANKRUPTCY JUDGE

35